Woodin v. SSA                    CV-95-601-M        12/18/96

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Charles Woodin,
      Plaintiff

      v.                                    Civil No. 95-601-M

Shirley Chater, Commissioner
Social Security Administration,
      Defendant.


O R D E R


Pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), Charles Woodin seeks review of a final decision by the Commissioner of the Social Security Administration, denying his claim for benefits.  Before the court is plaintiff's motion to reverse the decision of the Commissioner.  The Commissioner objects, and moves to affirm that order.  For the reasons set forth below, plaintiff's motion is granted and this matter is remanded to the Administrative Law Judge for further proceedings.


**Administrative Proceedings**

Plaintiff filed an application for disability insurance benefits on August 27, 1993.  His claim was denied initially and

again on reconsideration.  On June 16, 1994, he filed a request for hearing, which was held on January 9, 1995, before Administrative Law Judge Frederick Harp.  Plaintiff appeared in person and testified.  He was represented by Attorney Raymond Kelly.  Additionally, two of plaintiff's friends, Roger Levasseur and Dick Champagne, appeared and testified on his behalf.

## Stipulated Facts

Pursuant to this court's local rule 9.1(d), the parties have submitted a statement of stipulated facts.  Because of plaintiff's substantial medical history and the sizeable number of facts that the parties have deemed relevant to this proceeding, the court has incorporated the parties' stipulation as an appendix to this opinion.

## Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." Factual findings of the Secretary are conclusive if supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); Irlanda

2

Ortiz v. Secretary of Health and Human Services, 955 F.2d 765,
769 (1st Cir. 1991).[1]

In making those factual findings, the Commissioner
(formerly, the "Secretary") must weigh and resolve conflicts in
the evidence. Burgos Lopez v. Secretary of Health & Human
Services, 747 F.2d 37, 40 (1st Cir. 1984) (citing Sitar v.
Schweiker, 671 F.2d 19, 22 (1st Cir. 1982)). It is "the
responsibility of the Secretary to determine issues of
credibility and to draw inferences from the record evidence.
Indeed, the resolution of conflicts in the evidence is for the
Secretary, not the courts." Ortiz, 955 F.2d at 769. And, the
court will give deference to the ALJ's credibility
determinations, particularly where those determinations are
supported by specific findings. Frustaglia v. Secretary of
Health & Human Services, 829 F.2d 192, 195 (1st Cir. 1987)

Substantial evidence is "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229
(1938). It is something less than the weight of the evidence,
and the possibility of drawing two inconsistent conclusions from
the evidence does not prevent an administrative agency's finding
from being supported by substantial evidence. Consolo v. Federal
Maritime Comm'n., 383 U.S. 607, 620 (1966).

(citing <u>Da Rosa v. Secretary of Health and Human Services</u>, 803 F.2d 24, 26 (1st Cir. 1986)).

An individual seeking Social Security disability benefits is disabled under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). The Act places a heavy initial burden on the plaintiff to establish the existence of a disabling impairment. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146-47 (1987); <u>Santiago v. Secretary of Health and Human Services</u>, 944 F.2d 1, 5 (1st Cir. 1991). To satisfy that burden, the plaintiff must prove that his impairment prevents him from performing his former type of work. <u>Gray v. Heckler</u>, 760 F.2d 369, 371 (1st Cir. 1985) (citing <u>Goodermote v. Secretary of Health and Human Services</u>, 690 F.2d 5, 7 (1st Cir. 1982)). Nevertheless, the plaintiff is not required to establish a doubt-free claim; the initial burden is satisfied by the usual civil standard, a "preponderance of the evidence." See <u>Paone v. Schweiker</u>, 530 F. Supp. 808, 810-11 (S.D. Miss. 1982). In assessing a disability claim, the Secretary considers

4

objective and subjective factors, including: (1) objective medical facts; (2) plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witnesses; and (3) the plaintiff's educational background, age, and work experience. See, e.g., Avery v. Secretary of Health and Human Services, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote, 690 F.2d at 6.

Once the plaintiff has shown an inability to perform his previous work, the burden shifts to the Secretary to show that there are other jobs in the national economy that he can perform. Vazquez v. Secretary of Health and Human Services, 683 F.2d 1, 2 (1st Cir. 1982). If the Secretary shows the existence of other jobs which the plaintiff can perform, then the overall burden remains with the plaintiff. Hernandez v. Weinberger, 493 F.2d 1120, 1123 (1st Cir. 1974); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

When determining whether a plaintiff is disabled, the ALJ is required to make the following five inquiries:

    (1)  whether the claimant is engaged in substantial gainful activity;
    (2)  whether the claimant has a severe impairment;

(3) whether the impairment meets or equals a listed impairment;
(4) whether the impairment prevents the claimant from performing past relevant work; and
(5) whether the impairment prevents the claimant from doing any other work.

20 C.F.R. § 404.1520. Ultimately, a plaintiff is disabled only if his:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A).

With those principles in mind, the court reviews plaintiff's motion to reverse the decision of the Commissioner.

## III. DISCUSSION

In concluding that Mr. Woodin was not disabled within the meaning of the Act, the ALJ employed the mandatory five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920 (1995). Step 4 of the evaluation process requires the ALJ to determine whether, despite the plaintiff's impairment, he retains the residual functional capacity ("RFC") to perform his

past relevant work.  At step 4, the ALJ determined that plaintiff's RFC permitted him to perform the exertional and nonexertional requirements of light work and, therefore, he could perform his past relevant work as an automobile appraiser (Tr. 66).  Accordingly, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act.

A.    The ALJ's Reliance on Non-Treating Sources.

Plaintiff asserts that the ALJ erred as a matter of law by failing to give controlling weight to the opinions of his treating physicians or, at a minimum, explain why he decided not to afford those opinions such weight.  As plaintiff correctly notes, generally, the ALJ must afford more weight to the medical opinions of a claimant's treating physicians because those sources are:

> likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Of course, the ALJ may decide not to give controlling weight to the opinions of a plaintiff's treating

7

physicians.  However, if the ALJ does not give such controlling weight, he or she must "always give good reasons in [the] notice of determination or decision for the weight [the ALJ gave] to [the claimant's] treating source's opinion."  Id.

Here, plaintiff says that he had four "treating physicians": Dr. Edwin Bell (an osteopath), Dr. Anthony Salerni (a neurosurgeon),[2] Dr. Pierre Durand (a psychiatrist), and Dr. Ronald Aragona (a chiropractor).  Under the pertinent regulations, doctors Bell, Salerni, and Durand are considered "acceptable medical sources" for determining plaintiff's disability.  20 C.F.R. § 404.1513(a).  As a chiropractor, Dr. Aragona is considered "another source" of pertinent information regarding plaintiff's disability.  20 C.F.R. § 414.1513(e).[3]  The

---

It appears that plaintiff saw Dr. Salerni on only two occasions.  Because "the length of the treatment relationship and the frequency of examination," 20 U.S.C. § 404.1527(d)(2)(i), are relatively insubstantial, it is questionable whether Dr. Salerni actually qualifies as a "treating source" under the Regulations.  The ALJ did not address this issue in his decision and, for the purposes of this order, the court has assumed that Dr. Salerni is a "treating physician."  On remand, the ALJ is obviously at liberty to conclude that Dr. Salerni is not a treating physician, provided of course, that he adequately supports that determination with appropriate legal and factual findings.

Because chiropractors are not considered an acceptable source of medical evidence regarding a claimant's impairment, see 20 C.F.R. § 404.1513(a), the ALJ is entitled to give their

8

medical evidence and opinions submitted by those doctors support plaintiff's assertion that he is disabled. For example, in July of 1992, Dr. Bell opined that plaintiff's "ability to function in simple everyday activities is markedly impaired. The prognosis, as previous, is very poor. Disability remains total" (Tr. 230). Subsequently, Dr. Aragona opined that:

> The patient most certainly suffers severe post-traumatic spondylopathy and I have cared for over five-thousand spinal injury cases in over twenty-years, his condition is most certainly amongst the worst. I have never seen a patient who has endured so much pain for such a long period of time and who presents such a willingness to get well (Tr. 354).

> It is my professional opinion, based on more than twenty-years experience with individuals affected with spinal-related impairments that any sincere practitioner who may have the opportunity to examine this patient, would most certainly concur with not only his severe spinal-related impairments, but also with the obvious necessity for further medical/chiropractic remedial therapy (Tr. 356).

Ultimately, no one (including the Commissioner herself) doubts that plaintiff experiences pain and has some functional limitations due to his back condition. The pertinent question is, of course, whether plaintiff is "disabled" within the meaning

opinions regarding the nature and scope of the plaintiff's impairment less weight. <u>Diaz v. Secretary of Health & Human Services</u>, 59 F.3d 307, 314 (2d Cir. 1995); <u>Cronkhite v. Secretary of Health & Human Services</u>, 935 F.2d 133, 134 (8th Cir. 1991).

of the Act.  Despite the presence of a substantial volume of medical evidence suggesting that plaintiff is "disabled," still, a large portion of the record also consists of medical opinions from physicians who believe that there is little or no evidence of an organic basis for plaintiff's stilted posture or complaints of pain.

Dr. Donald Cusson, who performed an independent orthopedic examination, commented that he believed that plaintiff's posture and exaggerated gait are "theatrical" (Tr. 254) and "entirely voluntary" (Tr. 260).  Dr. Cusson concluded that plaintiff "has no residual disability from an organic orthopedic and neurological basis" (Tr. 260).  Similarly, Dr. David Lhowe, an orthopaedic surgeon who examined plaintiff in April of 1992, concluded that:

> In summary, I find that Mr. Woodin sustained a thoracolumbar strain and contusion at the time of his 4/25/91 injury.  At this time, it is likely that such an injury would have resolved sufficiently to permit him to return to the majority of his duties.  I cannot find any objective orthopedic basis for his continuing postural scoliosis. However, I am unable to determine whether his symptoms are hysterical (patient not attempting to deceive the examiner) or fabricated (patient consciously attempting to fabricate a condition).  The fact that Mr. Woodin's curvature could be significantly reduced on the examining table would suggest some degree of conscious exaggeration, in my opinion.  I feel that a psychiatric evaluation is indicated.  Regarding

10

his disability, I can find no objective orthopedic basis for his continued inability to return to work (Tr. 271-72).

Likewise, after examining plaintiff, Dr. Julie Heston, a neurologist, concluded:

> [T]he patient may well have sustained a thoracolumbar strain when he fell backwards at work on 4/25/91. I do not believe that there is any organic basis for his current posture or "scoliosis." Whether the etiology of this issue is for the purposes of secondary gain or is psychiatric in origin would need to be determined by a psychiatric consultation (Tr. 275).

In the final analysis, however, the court is constrained to conclude that the ALJ failed to adequately considered the opinions of plaintiff's treating physicians or, at a minimum, failed to "give good reasons in [the] notice of determination or decision for the weight [he gave] to [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2). Although there is certainly evidence in the record which suggests that there is no organic basis for the apparent severity of claimant's disability, his x-rays and MRI scans do show that he suffers from a compression deformity of the 11th thoracic vertebra (Tr. 199), degenerative disk narrowing, and an annular bulge at L2-3, L3-4, and L4-5 (Tr. at 287, 291). And, importantly, at least two of his "treating physicians" have opined that he is totally disabled

11

(see, e.g., Tr. 21, 230, 232). However, the ALJ did not explain why he discounted or discredited those opinions.[4]

Of course, because the four orthopedic surgeons who examined plaintiff (each of whom concluded that he was capable of performing at least non-exertional work) opined about medical issues related to their area of speciality, the ALJ was entitled to give their opinions substantial weight. 20 C.F.R. § 404.1527(d)(5). Again, however, the record does not explain why the ALJ elected to afford more weight to the opinions of those experts than to the opinions of claimant's "treating physicians," who are presumed to be "the medical professionals most able to provide a detailed, longitudinal picture of [claimant's] medical impairments" and provide "a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." 20 C.F.R. § 404.1527(d)(2).

_____

Because Dr. Aragona (one of plaintiff's treating physicians who opined that he was totally disabled) is a chiropractor, the ALJ was entitled to afford less weight to that opinion. Nevertheless, the ALJ, at least implicitly, appears to have credited a portion of Dr. Aragona's medical opinion (Tr. 63). The ALJ neglected, however, to explain why he chose to disregard Dr. Aragona's ultimate opinion that claimant is totally disabled and incapable of performing even sedentary work.

12

While acknowledging that Dr. Bell opined that plaintiff is "in acute distress at all times" and his "prognosis is extremely poor" (Tr. 232), the Commissioner asserts that those comments are based largely on plaintiff's subjective complaints of pain. Likewise, the Commissioner claims that Dr. Salerni's opinion that "at this point in time the patient appears to be totally disabled with spine pain" (Tr. 21), is also based largely on plaintiff's subjective complaints of pain. As the Commissioner correctly notes, the ALJ is "not required to accept the conclusions of plaintiff's treating physicians on the ultimate issue of disability." Arroyo v. Secretary of Health and Human Services, 932 F.2d 82, 89 (1st Cir. 1991). See also 20 C.F.R. § 404.1527(e) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

Here, however, the opinions from plaintiff's treating physicians are based upon more than merely plaintiff's subjective complaints of pain. Dr. Bell, for example, provided medical treatment to plaintiff on over 80 occasions. Certainly, his opinion that plaintiff is disabled is based upon more than merely plaintiff's complaints of pain (Tr. 222-241). Likewise, Dr.

13

Salerni performed a physical examination of plaintiff which, in addition to plaintiff's subjective complaints of pain, lead Dr. Salerni to believe that plaintiff's "musculature is extremely tense in the left lumbar region" and to conclude that "it is apparent to me that there is some underlying spinal condition that exacerbates the muscles and makes them reactive enough to spasm with activity and time" (Tr. 380). In short, the court cannot conclude that the opinions of those treating physicians were merely conclusory and unsubstantiated by physical examination and/or testing. Accordingly, the ALJ should have explained why he chose to discount (or disregard) those opinions.

B.    The ALJ's Credibility Determination.

The ALJ is required to consider the subjective complaints of pain or other symptoms by a plaintiff who presents a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." 42 U.S.C. § 423(d)(5)(A); Avery v. Secretary of Health and Human Services, 797 F.2d 19, 21 (1st Cir. 1986); 20 C.F.R. § 404.1529. "[C]omplaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." Dupuis v. Secretary of Health

and Human Services, 869 F.2d 622, 623 (1st Cir. 1989); see Bianchi v. Secretary of Health and Human Services, 764 F.2d 44, 45 (1st Cir. 1985) ("The Secretary is not required to take the plaintiff's assertions of pain at face value.") (quoting Burgos Lopez v. Secretary of Health and Human Services, 747 F.2d 37, 40 (1st Cir. 1984)). Once a medically determinable impairment is documented, the effects of pain must be considered at each step of the sequential evaluation process. 20 C.F.R. § 404.1529(d). A claimant's medical history and the objective medical evidence are considered reliable indicators from which the ALJ may draw reasonable conclusions regarding the intensity and persistence of the claimant's pain. Avery, 797 F.2d at 23; 20 C.F.R. § 404.1529(c)(3). However, situations exist in which the reported symptoms of pain suggest greater functional restrictions than can be demonstrated by the medical evidence alone. Id. The ALJ recognized that this is such a case. (Tr. 57, 63)

When a claimant complains that pain or other subjective symptoms are a significant factor limiting his or her ability to work, and those complaints are not fully supported by medical evidence contained in the record, the ALJ must consider additional evidence, such as the claimant's prior work record;

15

daily activities; location, duration, frequency, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, past or present; treatment, other than medication, received for relief of pain or other symptoms, past or present; any measures used, past or present, to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3); Avery, 797 F.2d at 23. If the complaints of pain are found to be credible under the criteria, the pain will be determined to diminish the claimant's capacity to work. 42 U.S.C. § 423(d); 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ concluded that plaintiff's "allegations of inability to work because of pain are somewhat exaggerated and are not entirely credible" (Tr. 64). In support of that conclusion, the ALJ noted that plaintiff's allegations of limitations exceed those which would be expected based solely upon the "clinical, objective findings of record" (Tr. 63). The ALJ then noted that: (1) plaintiff denied leg weakness or paresthesia and denied that any pain radiated to his legs; (2) when plaintiff was lying down, his spinal curvature significantly

16

decreased; (3) most physicians who examined plaintiff concluded that there was some degree of conscious exaggeration, possibly motivated by secondary gain; (4) plaintiff is able to twist his shoulders, trunk, and bend side to side without increased pain; and (5) plaintiff is able to care for his personal needs, drive his daughter to school, and drive to Dunkin' Donuts (Tr. 63-64).

However, the ALJ did not address the findings of Dr. Price, an orthopedic surgeon who noted that plaintiff's "skin has chronic masserations in the right folds of the flank from <u>fixed</u> lateral bending position" (Tr. 262, emphasis added; Tr. 265), and that plaintiff has "significant osteophytic changes on the right side at L1-2 and 2-3 levels [and] appears to have a partially sacralized L5" (Tr. 262). Likewise, the ALJ did not address Dr. Sachs's observation that plaintiff "shows excessive wear on the right heel in the lower aspect of the right side of his shoe compared to the left side" (Tr. 278-79) or Dr. Salerni's observation that plaintiff had developed a "substantial callous on his right hand because of the pressure he needed to place on [his] cane" (Tr. 379) or Dr. Aragona's statement that plaintiff's right hand has actually bled as a result of the shearing force applied by his persistent reliance on a cane (Tr. 348). Those

17

findings certainly support the view that plaintiff's pain and markedly awkward gait are real, rather than imagined, or simply faked when visiting his physicians. While this court would of course defer to an ALJ's properly supported credibility determinations, in this case it finds that the ALJ did not adequately support his conclusion that plaintiff's complaints of pain and inability to work were not credible.

In light of the foregoing, the court concludes that the ALJ erred as a matter of law when he failed to adequately consider the medical opinions of plaintiff's "treating physicians" (or, at a minimum, explain why he did not credit those opinions). 20 C.F.R. § 404.1527(d)(2). Additionally, the court finds that the ALJ's determination that plaintiff's subjective complaints of pain were not entirely credible is not adequately supported in the record. At a minimum, the ALJ should have addressed (and explained why he discounted) the material facts in the record which support plaintiff's assertion that his pain is real and substantial, rather than imagined or exaggerated (e.g., worn shoes, maceration on the skin edges as a result of prolonged and/or continuous postural deformity, etc.). See 20 C.F.R. § 404.1529(c)(3).

18

**Conclusion**

This is a close case. No one denies that Mr. Woodin experiences pain resulting from his accident in 1991, and it is clear that his pain has had a sizeable impact on his life. Nevertheless, medical experts who have examined him have reached divergent opinions regarding the nature, source, and severity of plaintiff's pain. In the end, the court finds that the ALJ's conclusion that Mr. Woodin is not disabled within the meaning of the Act is flawed in two material ways. First, the ALJ erred in applying the pertinent regulations when he neglected to adequately explain why he had not credited the opinions of plaintiff's treating physicians, who opined that plaintiff was disabled within the meaning of the Act. And, second, the ALJ's conclusion that plaintiff's subjective complaints of pain are not entirely credible is tainted because the ALJ failed to consider (or at least address) all relevant factual issues in the record in reaching that conclusion. See, e.g., Avery, 797 F.2d at 23.

Plaintiff's motion to reverse the decision of the Commissioner (document no. 9) is granted. The Commissioner's motion to affirm the decision of the Commissioner (document no. 11) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g),

19

this matter is remanded to the ALJ for further proceedings not inconsistent with this opinion. The ALJ may, at his option, elect to convene a new hearing or he may simply supplement his original opinion and: (1) clearly state the reason(s) that he failed to give plaintiff's treating sources controlling weight; and (2) more clearly explain why he apparently neglected to consider the substantial medical and non-medical evidence which suggests that plaintiff's pain and profoundly awkward posture and gait are real rather than imagined or fabricated.

The Clerk of the Court is instructed to enter judgment in favor of plaintiff, in accordance with the terms of this order.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

December 18, 1996

cc:  Raymond J. Kelly, Esq.
     David L. Broderick, Esq.

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Charles Woodin,
        Plaintiff

        v.                                          Civil No. 95-601-M

Shirley Chater, Commissioner
Social Security Administration,
        Defendant.


**Appendix - Stipulated Facts**

A.    Education And Work Background

Charles Woodin was born on June 25, 1942 and was 52 years old on the date of the ALJ hearing in January 1995 (Tr. 87, 108, 149).  He had a high school education and his past relevant work including [sic] employment as a lead man at Manchester Transit performing bus maintenance work, an auto salesman and auto appraiser, a truck driver, an owner and operator of an auto refurbishing business and a foreman at the upholstery department of a business that refurbished interiors of aircraft (Tr. 90, 159, 375).  At his most recent job as a lead man, he swept, cleaned and fueled buses and did minor repairs (Tr. 90-91).  He lifted up to 75 lbs. in carrying out his duties (Tr. 91).  In

21

April 1991, while cleaning a bus shelter, the plaintiff stepped back into a manhole and fell on his back (Tr. 92).

B. Medical History

David A. Graf, D.C., a chiropractic doctor, examined the plaintiff on April 26, 1991 the day after his injury (Tr. 187). Dr. Graf reported the plaintiff came to him complaining of pain between his shoulders, sharp left lower back pain, soreness and weakness in the shoulders, and neck stiffness and cracking (Tr. 187). He also presented with right antalgia (Tr. 187). Examination of the plaintiff revealed pain and restriction of motion in the cervical and lumbar areas (Tr. 187). X-rays showed osteophytic changes at C5, L3 and L4 (Tr. 187). On May 10, 1991, Dr. Graf indicated the plaintiff was disabled (Tr. 186). As of June 10, 1991 he had treated the plaintiff with very gentle spinal adjustments, ultrasound, and electrical stimulation with good success (Tr. 187). The plaintiff's antalgia was much improved immediately after treatment, but it returned if he did too much or moved wrong (Tr.187).

On June 3, 1991 Robert J. Weafer, M.D., an orthopedic surgeon, examined the plaintiff apparently for purposes of

worker's compensation (Tr. 189-192). The plaintiff reported that he experienced improvement in back pain for about two hours after a chiropractic treatment (Tr. 190). Physical examination revealed marked restrictions of major back movements and low back pain on all movements (Tr. 190). He stood with a right list and a consequent shallow scoliosis (Tr. 190). X-rays revealed C5-6 spondylosis[5] (Tr. 191). His diagnoses were cervical sprain/strain, essentially resolved; low back sprain/strain, and minor lumbar degenerative changes (Tr. 191). Dr. Weafer noted that the plaintiff had objective findings with a list being the most noteworthy (Tr. 192). He felt that the plaintiff could not return to his maintenance work at Manchester Transit but could perform work that involved: no repetitive bending; no forceful pushing/pulling; no climbing; no crawling; no lifting over 25 lbs.; and be able to sit and stand at will (Tr. 192). The estimated time for these restrictions was three to four weeks or possibly longer depending upon the results of additional diagnostic studies (Tr. 192).

---

Spondylosis - A term often applied to any lesion of the spine of a degenerative nature. Stedman's Medical Dictionary, 24th Ed., (1982), p. 1322)

23

Dr. Weafer examined the plaintiff again in August 1991 (Tr. 193-196). The plaintiff reported no significant changes in his condition and physical examination remained essentially stable. He ambulated with a cane in the right hand (Tr. 194). Medication included daily Naprosyn (Tr. 194). Dr. Weafer's diagnoses also remains the same. Dr. Weafer was unable to explain the plaintiff's protracted back pain (Tr. 195). However, his marked list was consistent with organic pathology (Tr. 195). Dr. Weafer concluded that the plaintiff could not return to his maintenance job (Tr. 195). He suggested work restrictions that included permission to sit and stand at will; no repetitive bending; no forceful pushing or pulling; no climbing, crawling or lifting in excess of 25 lbs. (Tr. 195). He could not estimate how long these restrictions would need to last (Tr. 195). His prognosis was persistent low back pain with an apparent resultant list whose etiology had yet to be defined (Tr. 196).

James Shea, M.D., F.A.C.S., an orthopedic surgeon, examined the plaintiff initially on June 17, 1991 (Tr. 198-199). The plaintiff complained of severe back pain and walked with a marked tilt of his torso anteriorly and to the right (Tr. 198). He wore a corset provided by his chiropractor (Tr. 198). Examination

24

revealed markedly limited range of motion in the back; moderate tenderness over the thoraco-lumbar junction and minimal tenderness over the lower lumbar spine; and x-rays of the thoracic and lumbar spine showed definite compression deformity of the 11th thoracic vertebra that was about 40% of the length of the vertebra and degenerative changes around this vertebra and degenerative changes of the lumbar spine (Tr. 199). Dr. Shea's diagnosis was severe thoraco-lumbar strain and compression deformity of 11th thoracic vertebra (Tr. 199). He prescribed Naprosyn 375 mg., twice a day and physiotherapy (Tr. 199). He felt the plaintiff was unable to work at that time (Tr. 199). On June 27, 1991, Dr. Shea reported the plaintiff was making very slow progress and was experiencing severe backache (Tr. 200). Physical examination showed he continued to walk with his torso tilted to the side and there was moderate tenderness over the thoraco-lumbar junction and the lumbar spine (Tr. 200). Neurological examination was unremarkable (Tr. 200). He was still unable to work (Tr. 200).

On August 1, 1991 Dr. Shea reported the plaintiff was making no progress (Tr. 200). Severe back pain continued and he began using a cane (Tr. 200). The plaintiff could not straighten up

fully (Tr. 200). There was tenderness over the lumbar area (Tr. 200). He was given a prescription to get a new cane (Tr. 200). Plaintiff's condition was unchanged at an August 13, 1991 exam (Tr. 201). An MRI (magnetic resonance imaging) was unremarkable without any evidence of herniated disc or spinal stenosis (Tr. 201). The plaintiff was reassured that his outlook would be good at that point in time (Tr. 201).

Plaintiff was provided physical therapy at the Fitness Network (Tr. 203-221). He was treated from June 18, 1991 to August 13, 1991 (Tr. 218-219).

The plaintiff began treatment with Edwin I. Bell, D.O., in August 1991 (Tr. 222). Dr. Bell treated the plaintiff on a regular basis up until May 1993 (Tr. 222-247). His records reflect over 80 office visits by the plaintiff (Tr. 222-247). After treating the plaintiff for almost 10 months Dr. Bell stated:

> Mr. Woodin continues to have extreme difficulty in ambulating. He remains in a side bent condition and the somatic dysfunctions which have persisted throughout our experience in the upper thoracic, lumbo-dorsal and lumbar regions continue to be evidenced. The pain is modified slightly by anti-inflammatory medication and manipulation, but the left hip pain

26

remains acute.  His ability to function in simple everyday activities is markedly impaired.  The prognosis, as previous, is very poor.  Disability remains total (Tr. 232).

Dr. Bell reported in July 1992 that ambulation, due to the plaintiff's side bent condition, was extremely handicapped and that it was difficult for the plaintiff to sit in an upright position when he was examined (Tr. 232).  He was obviously in acute distress at all times (Tr. 232).  In the weight bearing position, it was impossible to straighten him up by physical exertion from an outside source (Tr. 232).  He was considered totally disabled and his prognosis was extremely poor (Tr. 232).

In August 1992, Dr. Bell stated the plaintiff was "suffering from a gross musculoskeletal dysfunctional state with specific palpable muscular variations in the upper thoracic area, the lumbodorsal and low lumbar areas as well as para left hip and ilio-lumbar musculature (Tr. 236).  He was unable to achieve weight bearing erect position either standing or sitting and ambulation capability was all but lost without a cane (Tr. 236).

In January 1993, Dr. Bell indicated the plaintiff had shown marked improvement since institution of massage therapy in his

27

rehabilitation program (Tr. 243). He was able to achieve a more erect, ambulatory position, and had a reduction of muscle spasms (Tr. 243). There was an obvious alleviation of pain (Tr. 243). Office treatment notes from April and May 1993 revealed a diagnosis of somatic dysfunction of the lumbar and thoracic regions (Tr. 246). These notes also show that the plaintiff continued to complain of pain and that he still had a list to the right side (Tr. 246).

The plaintiff was examined by David B. Lewis, D.O. in November 1991 (Tr. 249-251). At that time the plaintiff complained of pain and significant sleep disturbance (Tr. 249). Examination showed the plaintiff walked with a right antalgic gait using a cane in the right hand and severely listing to the right (Tr. 250). Dr. Lewis' impression was that the plaintiff had multiple level lumbar disc degeneration without significant herniation; significant spinal postural changes while standing of unsure etiology; chronic pain, sleep disturbance and possible secondary depression; no clinical evidence of intraspinal pathology; and old T11 compression deformity (Tr. 250). He recommended a kenesio/swim therapy, use of muscle relaxants or low dose antidepressants at bed time and a trial of injection of

28

local anesthetic followed by an aggressive stretching program (Tr. 251).

Donald Cusson, M.D., an orthopedic surgeon, examined the plaintiff in February 1992 (Tr. 252-260). Dr. Cusson clearly disbelieved the plaintiff's subjective complaints of pain and discomfort. He felt that the plaintiff's marked list to the right was a markedly exaggerated position and described the plaintiff's posture several times as theatrical (Tr. 254, 256-257, 259). He felt that there was no organic basis, from his orthopedic and neurologic evaluation, for the plaintiff to maintain this posture (Tr. 259). Dr. Cusson concluded the plaintiff had no disability but had the ability to return to his work on a full time basis as a second shift boss (Tr. 260). He felt the plaintiff had considerable psychogenic overlay to account for his extremely awkward posture which was motivated to a large extent by secondary gain (Tr. 260).

William Price, M.D., an orthopedic surgeon, examined the plaintiff in March 1992 (Tr. 262-263). He reported the plaintiff's complaints of low back pain, listhesis to the right side anteriorly and weakness in his legs (Tr. 262). His physical

29

examination demonstrated, among other things, severe anterior fixed flexion deformity at the L/S (lumbo-sacral) spine with associated right listhesis fixed at approximately 30 degrees (Tr. 262). The plaintiff was not able to straighten out even with forced bending on physical examination (Tr. 262). He was tender at the 3-4 and 4-5 level on deep palpation posteriorly (Tr. 262). His skin had chronic maceration in the right folds of the flank from fixed lateral bending position (Tr. 262). Dr. Price noted that the plaintiff's MRI showed disc degeneration at the 2-3, 3-4, 4-5 discs (Tr. 262). His medical assessment was that the plaintiff had work related back injury causing left lumbar scoliosis of a significant degree causing decompensation of this gentleman's weight bearing axis with persistent significant pain despite bracing, therapy and chiropractic manipulations (Tr. 263). He did not release the plaintiff for a return to work (Tr. 264). In August 1992, Dr. Price stated that presumably the plaintiff acutely injured one of his degenerative discs when he fell and this resulted in his persistent pain and deformity (Tr. 265). He reported he agreed with Dr. Lhowe (see below) that the plaintiff had severe postural scoliosis but disagreed with Dr. Lhowe as to his suggestion that the plaintiff had a psychiatric illness (Tr. 265). He disagreed because he did not feel the

30

plaintiff was consciously exaggerating his posture, due to the fact, on his examination he had maceration about the skin edges secondary to this deformity and if he were doing this purely for a medical legal reason, he clearly would not be doing it at home and would not have developed maceration at the skin edges (Tr. 265).

David Lhowe, M.D., an orthopedic surgeon, examined the plaintiff in April 1992 at the workers' compensation carrier's request (Tr. 268-272). He reported the plaintiff's subjective complaints to include abnormal spinal curvature, lower back pain and bilateral upper buttock pain (Tr. 270). His examination provided a diagnoses of thoracolumbar sprain/contusion and thoracolumbar scoliosis (Tr. 271). The scoliosis was considered to be a very severe postural scoliosis as opposed to a structural scoliosis (Tr. 271). He couldn't find any objective orthopedic basis for the plaintiff's continuing postural scoliosis (Tr. 271). He was unable to determine whether his symptoms were hysterical (patient not attempting to deceive the examiner) or fabricated (patient consciously attempting to fabricate a condition (Tr. 271-272). Dr. Lhowe felt that because the plaintiff's curvature could be significantly reduced on the

31

examining table, this would suggest some degree of conscious exaggeration (Tr. 272). A psychiatric evaluation was recommended (Tr. 272). He could find no objective orthopedic basis for his continued inability to return to work (Tr. 272). Dr. Lhowe stated that the plaintiff should begin working on a part-time basis and should avoid lifting more than 30 pounds, stooping and crawling for a period of 6 weeks (Tr. 272). After this time period, plaintiff could resume his regular work duties.

The plaintiff was examined in August 1992 by Julie Heston, M.D., a specialist in neurology and psychiatry (Tr. 274-277). Dr. Heston's examination was essentially negative except for some tenderness over the L4 and L5 spinous process (Tr. 275). She felt the plaintiff might well have sustained a thoracolumbar strain when he injured himself in April 1991, but did not believe there was any organic basis for his current posture or scoliosis (Tr. 275). She recommended a psychiatric consultation to determine whether the plaintiff's scoliosis was for the purposes of secondary gain or psychiatric in origin (Tr. 275).

Barton Sachs, M.D., an orthopedic and general surgeon, examined the plaintiff in August 1992 (Tr. 278-284). His

32

examination revealed a spinal malalignment and shift to the right side; marked right-sided list and a forward list as well (Tr. 278). The plaintiff was unable to straighten up in the standing or supine position (Tr. 278). He had an asymmetric gait pattern of the shift to the right side (Tr. 278). However, plaintiff's motor power, sensation, and deep tendon reflexes were all intact (Tr. 279). He showed excessive wear on the right heel in the lower aspect of the right of his shoe compared to the left side (Tr. 278-279). X-rays showed some marked degenerative changes with some syndesmophytes and endesopathies present (Tr. 279, 281-283). His impression was marked spinal malalignment and shift which could be consistent with nerve root irritation such as a displaced nuclear disc fragment or possibly to the diastematomyelia[6] or other condition (Tr. 279). Further evaluation with an MRI scan well as a CT scan was recommended (Tr. 279).

An MRI scan and CT scan were done at Concord Hospital in September 1992 (Tr. 287-291). The MRI revealed minor scoliosis convex to the right, minor annular bulge at the L4-5 level

---

Diastematomyelia - A congenital fissure of the spinal cord frequently associated with spinal bifida. Taber's Medical Dictionary (15th Ed., F.A. Davis, 1986) p. 459.

without evidence of definite disc herniation, spinal or foramina stenosis (Tr. 287). The CT scan revealed minor annular bulge at the L2-3 and L3-4 levels and a moderate annular bulge at the L4-5 level (Tr. 291).

The Physical Therapy Department at Concord Hospital did a physical capacity examination on September 22, 1992 (Tr. 296-299). Joann David, the physical therapist, noted obvious gait deviations that included significant right lateral shift and trunk list primarily to the right and uneven step length (Tr. 297). His lateral shift and list was extremely moderate in degree with the plaintiff being unable to assume an upright position (Tr. 297). However, in the supine position, the plaintiff was able to assume a moderately improved erect position with minor difficulty (Tr. 297). A weighted capacity evaluation suggested an occasional ability to work at ten to fifteen pounds which would be at the sedentary exertional level primarily (Tr. 298). This sedentary work ability came with restrictions involving no actual lifting lower than waist level with shoulder to overhead limitations because of left shoulder flexibility problems to ten pounds (Tr. 298).

A. M. Drukteinis, M.D., J.D., pursuant to an apparent referral by Dr. Sachs, did a psychological back profile on the plaintiff in September 1992 (Tr. 300). Dr. Drukteinis performed seven psychological tests (Tr. 301-305). His conclusion from these tests was that the plaintiff showed psycho-social variables that carried a very poor prognosis (Tr. 301). Although the results from the test showed only mild or insignificant conditions (Tr. 301; cf 303-304). He indicated that his presentation of gross physical distortion was unusual, and considering the duration of the symptoms, a bleak picture for full rehabilitation was created (Tr. 301). He stated psychological testing did not show marked somatization potential, but several of the scales indicated factors of chronic pain behavior and psychological conflict (Tr. 301).

In August 1992 the plaintiff was referred by Dr. Sachs to Elliot Hospital Department of Rehabilitation Medicine for physical therapy (Tr. 307). The plaintiff received physical therapy from October 1992 until July 1993 (Tr. 309-337). Jim Kennett, PT reported to Dr. Sachs in January 1993 that the plaintiff's posture was extremely side bent right lower thoracic and lumbar spine with right shoulder lower, head and neck pulled

right and weight bearing right leg (Tr. 317). A cane was used to maintain balance (Tr. 317). There was extreme tightness, all musculature of back and hips (Tr. 317). The plaintiff was stuck in right side bending and couldn't move from that position in any direction (Tr. 317). He was able to ambulate with a straight cane and a great deal of difficulty for a short period of time (Tr. 318). After treating the plaintiff twice a week, he seemed to loosen up a little but was not able to maintain the changes and thus there were no noted functional changes (Tr. 318). Progress notes showed little change in the plaintiff's condition throughout his treatment (Tr. 319-331).

In March, 1993, Kenneth Polivy, M.D., an orthopedic surgeon, performed an examination on the plaintiff (Tr. 338-340). Dr. Polivy's impression was that the plaintiff suffered thoracolumbar sprain causally related to his work injury in April 1991 (Tr. 340). Dr. Polivy could not find an orthopedic entity which would explain the plaintiff's symptomatology (Tr. 340). From an orthopedic stand-point he felt the plaintiff was capable of returning to his prior work (Tr. 340). He felt that the plaintiff's main problem was psychogenic in nature and that

36

underlying psychological factors appeared to be limiting his response to objective improvement (Tr. 340).

In November, 1993, Larry Politz, M.D. performed a psychiatric examination on the plaintiff at Social Security's request (Tr. 368-371). Dr. Politz noted the plaintiff's awkward crooked fashion of sitting and very awkward, distorted gait (Tr. 369-370). His impression was that the way the plaintiff handled pain, distress, limitations, etc. most likely did affect his presentation, his function and subjective experience of pain (Tr. 371). Dr. Politz found plaintiff had the ability to understand tasks, remember and carry out instructions and respond appropriately to supervision, co-workers and work pressures was intact (Tr. 371). He also felt the plaintiff could manage his own funds (Tr. 371).

Ronald J. Aragona, D.C., Ph.D. began treating the plaintiff in July 1993 and was treating the plaintiff at the time of the hearing (Tr. 95, 342-391). In his initial office notes, Dr. Aragona stated the plaintiff had gone through torment and agony to a degree that he purchased a special brace for $2,300 and was making regular payments on this expense (Tr. 342). He noted the

37

plaintiff had a 35 degree list to the right while sitting and standing (Tr. 342). His examination revealed overt and massive right occipitoatlantoaxial spasm, myalgic pain on light to moderate palpation (Tr. 342). He diagnosed severe spondylopathy[7]; suspect overt instability; abnormal anatomic alignment relationships; cervical instability; mid/thoracic severe instability; and possible low back discopathy (Tr. 344). His impression from the x-rays was that they showed highly unstable low back with severe anatomic/osseous factors of vertebral subluxation misalignments (Tr. 346). "This patient is overtly impaired as a result of his injury and demonstrates severe instability, as aforementioned." (Tr. 346). In another office note in July 1993 Dr. Aragona indicated it was his understanding that on several occasions the plaintiff's right palm actually bled from shearing stress applied on his cane (Tr. 348).

In August 1993 Dr. Aragona wrote a letter to Attorney Shaughnessy in which he stated the plaintiff most certainly suffered from severe post-traumatic spondylopathy and that in

---

Spondylopathy - Any disease of the vertebrae or spinal column. Stedman's Medical Dictionary, 24th Edition (1982), p. 1322.

treating over five thousand spinal cases in over twenty years, the plaintiff's condition was certainly among the worst (Tr. 353-354). He also stated he had never seen a patient who had endured so much pain for such a long period and who presented such willingness to get well (Tr. 354). In spite of some occasional asymptomatic periods following extended therapy, the plaintiff was not considered to be stable and his prognosis was guarded (Tr. 354-355). His spinal related impairments were considered to be severe thus necessitating further medical/chiropractic remedial therapy (contrary to the opinion of an orthopedic doctor) (Tr. 356).

In March 1994, Dr. Aragona stated that due to the nature of the plaintiff's impairments, he could not be gainfully employed until significant resolve manifests (Tr. 367). In January 1995, Dr. Aragona reported the plaintiff did not even have the capacity to perform sedentary work (Tr. 386). He stated that the plaintiff suffered from unusual failed back syndrome with concomitant degenerative disc disease and disc space narrowing in the lower lumbar spine, as well as thoracolumbar instability, permanent gait abnormality, secondary to pelvic deformity and severely weakened paraspinal supportive muscles which were

39

incapable of holding him in an upright position (Tr. 385). Finally, Dr. Aragona provided a medical assessment to perform work related activities (Tr. 387-391). He essentially limited the plaintiff's functional capacity to less than the sedentary exertional level and noted the plaintiff was very frequently in tears because of severe paraspinal muscle spasms and that he would become extremely depressed over his inability to be of any physical use, not only in the job environment, but in his home (Tr. 387-391).

Anthony Salerni, M.D., a neurological surgeon, reported in November 1994 that the plaintiff had experienced some improvement in his condition after treatment from Dr. Aragona (Tr. 379). He had been able to walk without a cane at that time and if he did absolutely nothing and was straightened out, it could last up to three days (Tr. 379).

B.    Testimony At Hearing (January 9, 1995)

The plaintiff testified that he couldn't work because of his back impairment which caused him to tilt to the right and experience pain up his back (Tr. 95). He was taking Motrin 800 mg. which relieved his pain (Tr. 97-98).

He often spent his afternoons lying down to obtain relief from his pain (Tr. 99). He indicated he couldn't sit for long periods without discomfort and shortly into the hearing had to stand up to relieve the discomfort (Tr. 101-120). Plaintiff estimated he could only stand 15 minutes when in a tilted position (Tr. 102), and about 20 minutes when he wasn't in a tilted position (Tr. 102). He related he used up to two canes for balance in the past but had recently tried to function without a cane (Tr. 102-103). The pain would disturb his sleep at night (Tr. 106). He was 5'6" and weighed 207 lbs. and pursuant to doctor's recommendations had lost 35-40 pounds since the date of his injury (Tr. 100). He performed exercises for his back that were prescribed by Dr. Aragona (Tr. 99-100).

The plaintiff testified that he felt he could not work because his walking and carrying were impaired and he didn't feel he could drive a truck again (Tr. 103). He was capable of driving his daughter to school but that was only 3 or 4 miles (Tr. 103). His truck, driving job required him to lift more than 50 pounds (Tr. 105). His other job as a trimmer renovating auto interiors required lifting and carrying which he felt he couldn't do (Tr. 104-105).

41

Plaintiff's activities included, in addition to driving his daughter to school, sometimes visiting his friend Roger Levasseur and helping his son with his car (Tr. 98, 104). If his back was straightened, he tried to do a waltz at the social club he belonged to although he hadn't danced a waltz in three months (Tr. 98, 101). He apparently went to the social club on occasion and sat and talked (Tr. 101).

Roger Levasseur, a friend of the plaintiff' since 1989 or 1990, testified that he worked with the plaintiff at Manchester Transit (Tr. 110). He stated the plaintiff had no apparent back problem prior to the injury he sustained in April, 1991 (Tr. 111). After the injury he indicated the plaintiff walked real crooked (Tr. 111). He had to have help walking and couldn't pick up anything (Tr. 111). Mr. Levasseur reported that he had helped the plaintiff with chores around the house, did some remodeling and helped him work on his motor vehicles (Tr. 111). He also drove the plaintiff to his medical appointments (Tr. 112-113). His observation of the plaintiff's posture was that the plaintiff would look straight for a couple days after visiting Dr. Aragona but then he would start to lean over again (Tr. 112).

Richard Champagne, another friend of the plaintiff's, testified that the plaintiff prior to his injury was an active dancer at a country and western dance place but no longer was able to participate as he did in the past (Tr. 114-115).